**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**


| | | |
|---|---|---|
| Kris Radzanowski, | ) | CASE NO.  1:11 CV 463 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| vs. | ) | |
| | ) | |
| Principal Financial Group, et al., | ) | <u>Memorandum of Opinion and Order</u> |
| | ) | |
| Defendants. | ) | |

### <u>Introduction</u>

This matter is before the Court upon defendants' Motion for Summary Judgment

(Doc. 20) and defendants' Motion to Strike (Doc. 28).  For the following reasons, the Motion

for Summary Judgment is GRANTED and the Motion to Strike is GRANTED IN PART and

DENIED IN PART.

### <u>Facts</u>

Plaintiff, Kris Radzanowski, filed her Complaint against defendants, Principal

Financial Group, Jack Waldie, and Greg Mollman, in the Cuyahoga County Common Pleas

Court.  The matter was removed to this Court on the basis of diversity jurisdiction.

1

The Complaint alleges the following.  Plaintiff is a female who was hired by defendants in 2005.  In February 2007, plaintiff became pregnant and was very ill throughout her pregnancy.  In September 2007, she was put on a bed rest due to her pregnancy. Plaintiff's son was born in October 2007, and she took maternity leave.  Plaintiff returned to work in February 2008.  In June 2009, Jack Waldie replaced Greg Mollman as regional vice president.  Waldie immediately began to harass and discriminate against plaintiff due to her gender.

The Complaint states that it is brought pursuant to Ohio Revised Code § 4112.02 and Ohio's public policy, but no separate counts or claims are asserted. The Complaint asserts that "defendants treated plaintiff differently in the terms and conditions of employment as compared to similarly situated employees due to, in part, her gender, her past pregnancy[,] and her parental status"; she was "treated differently and harassed" because of her gender and pregnancy; and she was terminated on January 15, 2010 due, in part, to her gender, past pregnancy, and parental status.  The Complaint also refers to retaliation. (Compl. ¶¶ 13-16)

Defendants filed a motion to dismiss the Complaint. In response, plaintiff sought leave to amend.  While the Court granted plaintiff's request, she has failed to amend her Complaint.

The following facts are taken from evidence submitted by the parties.  Plaintiff was employed by Principal Financial Group (Principal) in its Cleveland office as a sales representative, or "wholesaler," from the end of 2005 through her termination in January 2010. Plaintiff "worked through brokers" to sell Principal's line of products including "dental, life, disability, and vision" to employers.  Plaintiff had certain sales goals throughout her employment and was paid a salary as well as commissions.  At the time she was hired, there

2

was one other wholesaler in Cleveland, Ernie Ash, who had been employed with Principal for 25 years.  (pltf. depo.)

During her employment, plaintiff's direct supervisor was Hugh White, who was stationed in Columbus.  (pltf. depo.)  White reported to Greg Mollman, Regional Vice President, until November 2008 when Jack Waldie replaced Mollman.  (Mollman aff.) Plaintiff did not have a supervisor stationed in Cleveland.  She communicated with her supervisors through phone and email, and an in-person meeting three or four times a year. (pltf. depo.)

Plaintiff testified that in 2006 her sales goal was $1.2 million.  At that time, the sales goal was based on the sales representative's experience, the market, and the economy. Plaintiff met her sales goal that year.  Plaintiff learned she was pregnant in February 2007, and immediately felt sick.  In 2007, Principal increased the sales goals "for everybody across the country" to $3.2 million.  Plaintiff testified that Mollman "initially told me not to worry about the 3.2 goal, that it wasn't fair and I wouldn't be expected to hit it."  Plaintiff did not meet this goal and was given verbal warnings.   (pltf. depo.)

According to Mollman, plaintiff performed well until 2007, meeting her sales goal in 2006.  He acknowledged that prior to 2007, sales goals were individually set.  Starting in 2007, goals were set based on sales representatives' titles. Plaintiff performed poorly in 2007 and was given verbal warnings that she was not on track to meet her goal.  Ultimately, plaintiff reached only $1.12 million- 35% of her 2007 goal.  (Mollman aff.)

In June 2007, plaintiff requested to take 12 weeks maternity leave under the Family

3

and Medical Leave Act.[1]  Plaintiff was given approval of her request.  She was off work from September 2007 through February 2008, which included a period of time-off prior to her son's birth in October 2007.  (pltf. depo.; Ex.C)

Mollman avers that prior to going out on leave, he and Hugh White met with plaintiff on August 15, 2007 to discuss her sales goals.  Mollman and White told plaintiff that her overall 2008 sales goal would be reduced by 25% in recognition of her upcoming leave of absence.  Plaintiff was advised that she needed to meet 75% of her goal in March through May 2008, or she would be placed on written warning.  She was further advised that if she failed to meet 75% of this goal, she must meet 75% of her June through August 2008 sales goal or she would be subject to disciplinary action, up to and including termination. (Mollman aff.; pltf. depo. Ex. D)

Plaintiff returned from her leave of absence in February 2008.  Plaintiff acknowledged that she did not meet her sales goal for March through May 2008.  (pltf. depo.) By Memorandum dated July 2, 2008, Mollman issued plaintiff a written warning stating:

> We have discussed your performance on several occasions including a discussion on August 15, 2007 when Hugh and I previewed you would be placed on Written Warning if you did not meet or exceed 75% of your March, April, May 2008 Playbook Sales Goal.
>
> Our most recent discussion was on June 23, 2008.  As we discussed on that date, your sales production was $173,791 for March, April and May, 2008, vs. required production of $337,722 (51% of Goal).
>
> As a result of being at 51% of goal for March, April and May, 2008, you are being placed on Written Warning.

---

[1]    Defendants state that Principal did not employ the requisite number of employees so as to require that it be bound by the FMLA.

4

(pltf. depo. Ex. I) The written warning required that plaintiff meet 75% of her June through August 2008 sales goal, produce a minimum of 200 coverage opportunities per month, and have bi-weekly meetings with Hugh White to review her progress.  (*Id.*)  According to Mollman, plaintiff made some progress but still failed to meet all the terms of the written warning.  Plaintiff ultimately met only 57% of her revised 2008 sales goal.  (Mollman aff.; pltf. depo. Ex. K)

Plaintiff testified that at the end of 2008, Principal had a reduction in force which resulted in the termination of Ernie Ash, the other wholesaler in the Cleveland office. Plaintiff was retained although she had less seniority than Ash.  (pltf. depo.)  In November 2008, Waldie replaced Mollman as Regional Vice President covering Ohio.  (Mollman aff.)

In 2009, plaintiff's sales goal was initially set at $1.8 million, but she voluntarily set it at $2 million so that she could be eligible for a bonus.  (pltf. depo.)  Jack Waldie avers that as of July 2009, plaintiff was only at 48% of her $2 million goal.  As a result, she was placed on a final warning which required her to, among other things, deliver $207,836 in sales, underwrite 15 cases per month, and have weekly conference calls with Waldie to discuss her progress. Waldie had the weekly telephone calls, but plaintiff failed to meet the requirements set forth in the final warning.  (Waldie aff.)

The June 26, 2009 Memorandum from Waldie to plaintiff which issues the final warning states in part:

Background/Concerns

•       2007 you delivered only 35% of your annual sales goal

•       2008 you delivered 43% of your sales goal

5

- July 2008 you were placed on Written Warning, you made some progress but you did not meet the ongoing terms of the warning

- July 2009 you are at 960 870 with your June and July estimates. This would place you at 48% of your goal

(pltf. depo. Ex.L) The final warning stated defendants' expectations and that termination would occur if plaintiff failed to meet the expectations. (*Id.*)

Plaintiff testified that she had the weekly calls but did not meet her 2009 sales goal because she "had 1.78" and her goal was $2 million.  (pltf. depo.) According to Waldie, plaintiff was terminated on January 15, 2010 for failing to meet her sales goals for 2007, 2008, and 2009.  (Waldie aff.)  Plaintiff was replaced by a male.  (Waldie depo.)

Plaintiff testified that she complained to Human Resources "probably" around the time of her written warning in 2008 and again in 2009 after her final warning "that what I was feeling wasn't right and what could I do."  She was told to make written comments in the "employee comments" section of the warnings.  (pltf. depo.) Plaintiff did make comments in the July 2008 and June 2009 warnings, but the Court is unable to decipher the comments. (pltf. depo. Exs. I, L) Defendants state that plaintiff made no mention of discrimination or harassment.  Plaintiff does not dispute this assertion.

Plaintiff testified that she also had a discussion with Vice President of Sales Geoff Apgar who indicated to her that "they" were trying to get rid of her. (pltf. depo.)

Plaintiff submits her own affidavit, portions of which are subject to the Motion to Strike which is discussed below.  Plaintiff attests in pertinent part to the following.

The goals Principal set in 2007 for all sales representatives were "unreasonable," and during the course of the year the company acknowledged such.  To plaintiff's knowledge,

other male sales people who were experiencing the same unreasonable sales goals were not given verbal warnings as plaintiff had despite her pregnancy related issues. During the time Waldie was her supervisor, he spent little time assisting plaintiff while spending substantial time assisting male sales representatives which included taking them golfing.  (pltf. aff.)

> Plaintiff further avers:
>
> Despite the tough economic times I and the Cleveland market was performing better than other markets across the nation.  In fact in list produced in showing sales results through March 31, 2009 it listed my BAP (base annual premium) at $1,013,760 (that document is attached to this affidavit as exhibit A).  My results through May 1, 2009 showed a grand total of $1,226,828.  (That document is attached as Exhibit B) As of May 1, 2009 I had  exceeded the sales of many of the male associates across the nation.  A June 30, 2009 year to date Goals and Actual Report demonstrated that I had 113% of my goal through that date. (A true copy of that document is attached hereto as Exhibit C.)

(*Id.*)  Plaintiff also avers that in June 2009, "despite having met approximately 50% of my yearly goal thus far," she was put on final warning by Waldie who also stated for the first time that "he was not going to consider the National Account sale that I obtained despite the fact that those numbers were listed on [Principal's] sales records and had been credited to me."  Plaintiff additionally avers,

> In October 2009 a memorandum was sent out documenting the sales for Eastern area. It documented the 'sales stars' for that group.  Out of approximately 30 salespeople only 4 had reached their sales goal.  I was listed as being 3rd highest in the region for submitting RFPs. (A true copy of that that [sic] list is attached as Exhibit D.)

(*Id.*)  Finally, plaintiff avers that at the end of 2009, her documented sales were $1,743,000 or 87% of her $2 million goal.  (*Id.*)

This matter is now before the Court upon defendants' Motion to Strike and Motion for Summary Judgment.

### (1) Motion to Strike

Defendants move to strike portions of plaintiff's affidavit which they assert are contradictory to plaintiff's sworn deposition testimony.  Additionally, defendants ask the Court to strike documents attached to plaintiff's affidavit which defendants contend were never produced in discovery despite document requests served by defendants, and whose meaning is not readily apparent from the face of the documents.

"A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts her earlier deposition testimony." *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986). When faced with a request to strike a post-deposition affidavit, this Court "must first determine whether the affidavit directly contradicts the nonmoving party's prior sworn testimony." *Aerel, S.R.L., v. PCC Airfoils, L.L.C.,* 448 F.3d 899, 908 (6th Cir.2006). If such a contradiction is found, this Court must strike the affidavit "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Id.*

Defendants seek to strike the following portions of plaintiff's affidavit:

Paragraph 5 of the affidavit which states in part, "To my knowledge, other male sales people who were experiencing the same unreasonable sales goals [in 2007] were not given verbal warnings."

Paragraph 9 which states, "During the time that Jack Waldie was my supervisor he spent little time assisting me, however, he did spend a substantial amount of time assisting the male members of his sales force.  He would take them golfing and assist them with sales but he provided little to no assistance to me."

Paragraph 15 which states, "I believe that both my gender and my prior pregnancy

8

played a role in the decision to terminate my employment.  Jack Waldie treated me differently than the male sales associates."

Defendants point out that plaintiff testified that in 2007, Principal increased the goals for everyone across the country.  (pltf. depo. 45)  But, Paragraph 5 of the affidavit states, "In 2007 the company had set unreasonable goals for all of sales representatives."  Thus, there is no contradiction.

Next, defendants cite to deposition testimony which they assert contradicts the averments in Paragraphs 5, 9, and 15, above, which relate to Waldie's preferential treatment of males:

> Q.  Okay.  Do you know if anybody else was on a final written warning at Principal as a wholesaler?
>
> A.  No.

(*Id.* 96) And, plaintiff testified that she did not know if Ernie Ash "had warnings."  (*Id.* 77-78) Plaintiff complained that when she returned from leave in 2008 she was expected to "jump right back into work" and was not given any "time to get back up and running again."  When asked whether Principal applied this to anybody returning from medical leave, plaintiff responded, "I don't know."    (*Id.* 64-66) Finally, when questioned whether Waldie was demanding regarding sales as to everybody, plaintiff stated that she did not know:

> Q.  Okay.  It sounds like [Waldie] was demanding and he was very objective as to the sales, are you meeting them or not?
>
> A.  Yes.
>
> Q.  Okay.  Do you know if he was that way to everybody?
>
> A.  I don't know.

9

(*Id.* 96) And,

> Q.   Okay.  And you understand what I'm saying by that?  A supervisor can give you kudos and hope that you improve or they can go from a negative standpoint.  I take it that Waldie was a negative supervisor?
>
> A.  Yes.
>
> Q.  Do you know if he was like that to Ernie and others?
>
> A.  I do not know.

(*Id.* 97-98)

The Court does not find this testimony to directly contradict plaintiff's averments that similarly situated males were not given verbal warnings and that Waldie assisted males and took them golfing because plaintiff was not asked about verbal warnings or Waldie's assistance to males.  Plaintiff's averment that Waldie treated her differently than the males is too general to directly contradict the responses given by plaintiff in deposition to specific instances of treatment.

In her brief opposing the Motion to Strike, plaintiff refers to her deposition testimony that Waldie treated her "different than he was treating everybody else."  (*Id.* 107) In reply, defendants correctly point out that this testimony only related to a conversation plaintiff had in 2009 with Geoff Apgar who, according to plaintiff's testimony, was a vice-president of national accounts stationed in Chicago.  The conversation occurred over the telephone and plaintiff did not "remember the exact words."  (*Id.* 106-113)

Defendants incorrectly assert, however, that all of plaintiff's testimony in this regard concerns the discussions she had with Apgar.  Rather, it is clear that defendant's counsel was attempting to summarize at deposition plaintiff's testimony as a whole as to harassment and

10

different treatment.  In the testimony, plaintiff states that Waldie treated her differently from the males:

> Q.  Okay.  And I take it - - did you tell the vice-president anything different than what you told me here today?
>
> A.  No.
>
> Q.  Okay.  So there was- - you know, just to summarize this, as to Waldie, he never sexually harassed you, right?
>
> A. No.
>
> Q.  And you're saying that I'm correct that he never harassed you, right?
>
> A.  Sexual harassment, no.
>
> Q.  Okay.
>
> A.  Other than- - we want to be clear on sexual harassment, he never touched me, he never commented sexually to me.  The fact that he treats me different than he treated the males in the same position, yes, he treated me differently.
>
> Q.  Okay.  Did you ever witness him interacting with a male wholesaler in your presence?
>
> A.  Yes.
>
> Q.  Okay.  When?
>
> A.  On different annual trips and in trips to Pittsburgh and in trips to Cincinnati.

(*Id.* 116-117) And,

> Q.  Okay.  And when you say- - well first of all, we verified there was no sexual type comments to you.  Did he ever make any explicit gender comments where 'I don't employ females' to you?
>
> A. Specifically like that?
>
> Q.  Yes.
>
> A. No.  But when he would go to other offices and take the other sales reps out to

dinner, spend time with them, take them on broker calls, golf outings- -

Q.  Okay.

A.  - - he didn't do that with me.

Q.  Okay.  And how did you learn about him going out to dinner, golf outings with others?

A.  It's pretty common knowledge.

Q.  Well, how did you hear about it?

A. From those sales reps.

Q.  Okay.

A. From their office staff.

 (*Id.* 118-119) This testimony is in accord with plaintiff's averments that Waldie assisted the males and took them golfing, and treated plaintiff differently than the males. For these reasons, the Court declines to strike Paragraph 5, 9, and 15 as directly contradictory to plaintiff's deposition.

The Court next turns to the four documents appended to plaintiff's affidavit.  (Doc. 24, pltf. aff. Exs. A-D) The portions of the affidavit, set forth in the factual section above, include the references to these documents.

Defendants' counsel submits her own affidavit stating that these documents were never produced through discovery and "[t]he meanings of the documents ... are not readily apparent from the face of the documents and deposition testimony would have shed light on their true meaning."  (Liana Hollingsworth aff.)

In response, plaintiff states,

First, plaintiff's counsel believes that said documents were produced to the defendants

12

during discovery but even if they inadvertently were not produced defendants'
objection to the documents is misplaced. The documents are the defendants'
documents not some documents created by the plaintiff. They are all sales reports and
internal Principal documents regarding the sales stars and the amount of sales
attributed to the different sales people. Curiously, the defendants did not produce these
documents in their discovery responses despite the documents clearly being relevant
to their claim that the plaintiff was terminated for failing to meet her sales objectives.

(Doc. 29 at 2-3)

The Court finds that the documents must be stricken. At a minimum, it is unclear to

the Court whether these are complete documents. Moreover, the Court has not been informed

through testimony as to the source of the documents. Nor does plaintiff's affidavit illuminate

the meaning of the documents. Further, plaintiff points to no other affidavit or deposition

testimony which provides an explanation as to what these documents are.

The documents are not authenticated. Plaintiff's affidavit does not attempt to

authenticate the documents. Nor does it appear that plaintiff would have personal knowledge

to do so. The Sixth Circuit "has repeatedly emphasized that unauthenticated documents do

not meet the requirements of Rule 56(e). *Michigan Paytel Joint Venture v. City of Detroit*,

287 F.3d 527, 532 n. 5 (6th Cir.2002); *see also Moore v. Holbrook*, 2 F.3d 697, 699 (6th

Cir.1993) ("This court has ruled that documents submitted in support of a motion for

summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be

disregarded.") )

Moreover, the dearth of an explanation for the documents is underscored by the

seeming inconsistency in plaintiff's affidavit. For instance, plaintiff avers, "A June 30, 2009

year to date Goals and Actual Report demonstrated that I had 113% of my goal through that

date. (A true copy of that document is attached hereto as Exhibit C.)" Yet, she avers in the

13

next paragraph, "In June of 2009, despite having met approximately 50% of my yearly goal thus far..."  And, "At the end of 2009" she had 87% of her goal.  (¶¶ 10, 11, 14) Thus, while plaintiff seems to state that the documents showed that she well exceeded her 2009 goal, she also acknowledges that she finished the year under the goal.  Without an explanation of the documents, the Court is unable to interpret them.  They will not be considered.

For these reasons, defendants' Motion to Strike is denied as to the portions of the affidavit at issue and granted as to the documents attached.

**(2) Motion for Summary Judgment**

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial. If he does not respond, summary judgment, if appropriate, shall be entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**<u>Discussion</u>**

Considering the confusing nature of the Complaint, discussed above, defendant moved for summary judgment on plaintiff's claims for pregnancy discrimination, gender discrimination, and sexual harassment. Plaintiff's brief in opposition to the Motion for

15

Summary Judgment clarifies that plaintiff is alleging only that her termination was a result of her gender.  Plaintiff states that she "is not pursuing a claim of sexual harassment."  (Doc. 24 at 2) While plaintiff states in the introductory paragraph of her brief that she was discriminated against and retaliated against on the basis of her gender and her status as a formerly pregnant person, she does not address retaliation or pregnancy discrimination. Therefore, the Court only addresses gender discrimination.[2]

Absent direct evidence, to establish a prima facie case of unlawful gender discrimination, plaintiff must show: (1) she is female, (2) she was subjected to an adverse employment decision, (3) she was qualified for her position, and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Lyons v. Metropolitan Government of Nashville and Davidson County,* 416 F.Appx. 483 (6th Cir. 2011) (citations omitted).[3]

In reply, defendants concede that plaintiff has established an indirect evidence prima facie case.  (Doc. 27 at 8) The Court assumes the prima facie case is satisfied and proceeds to whether defendants' stated reason for terminating plaintiff was a pretext for gender discrimination.[4]

---

[2]     To the extent the Complaint does allege pregnancy discrimination, summary judgment is warranted for the unopposed reasons asserted by defendants.

[3]     Although plaintiff's claim of gender discrimination is brought under Ohio law, it is well-settled that this claim is analyzed under the same framework which applies to Title VII.  *See Thompson v. UHHS Richmond Heights Hosp.,Inc.,* 372 Fed.Appx. 620 (6th Cir. 2010).

[4]     Because defendants concede the prima facie case through indirect evidence, the Court need not address plaintiff's assertion that she also has direct evidence in the form of Geoff Apgar's statement that defendants were trying to get rid of plaintiff because she is female.

16

Defendants must present a legitimate, nondiscriminatory basis for plaintiff's termination.  *Wright v. Murray Guard, Inc*., 455 F.3d 702, 706 (6th Cir.2006).   Defendants have done so by asserting that plaintiff had failed to meet her sales goals for 2007, 2008, and 2009, and had an "awful start" to 2010.  (Waldie depo. 46-47)

The burden then shifts to plaintiff to prove by a preponderance of the evidence that the legitimate reason offered by defendants is not its true reason, but was a pretext for discrimination.  *Corell v. CSX Transp. Inc.,* 378 Fed.Appx. 496 (6th Cir. 2010) (citations omitted). "A plaintiff may rebut a defendant's legitimate, nondiscriminatory reason and demonstrate pretext with one (or more) of three showings: (1) the employer's stated reason for terminating the employee has no basis in fact, (2) the reason offered for terminating the employee was not the actual reason for the termination, or (3) the reason offered was insufficient to explain the employer's action." *Algie v. Northern Kentucky University*, 2012 WL 34373 (6th Cir. Jan. 9, 2012) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994), overruled on other grounds, *Geiger v. Tower Auto*., 579 F.3d 614 (6th Cir.2009)).

Plaintiff asserts that defendant's reason has no basis in fact.

Plaintiff maintains that a review of her 2009 work performance belies defendants' contentions that she was terminated based on her performance.  Relying on one of the documents previously stricken (Exhibit C to plaintiff's affidavit), plaintiff asserts that as of June 2009 she had actually exceeded her goals by selling 113% of her goal. On this basis, plaintiff contends that Waldie falsely stated that she was not meeting her 2009 goals, and that she was actually performing well. As discussed previously, Exhibit C was not authenticated

17

and this Court is unable to interpret it without testimony explaining it.  Even if the Court were

to consider the document, plaintiff's assertion that she actually had 113% of her goal in June

2009 is contradicted by her own affidavit testimony that in June 2009 she had met

approximately 50% of her yearly goal.  (pltf. aff. ¶ 11) Moreover, plaintiff acknowledged at

deposition that she did not meet her 2009 goal:

> Q. ... let's look at 2009- - how were your sales in 2009?
>
> A.  I feel they were good.
>
> Q.  Okay.  Well, what did you hit?
>
> A.  I had 1.78
>
> Q.  1.78.  And what was your goal?
>
> A.  My goal was initially set at 1.8.
>
> Q.  Okay.  And what was it moved to?
>
> A.  It was moved to 2 million.

(pltf. depo. 88-89) Thus, plaintiff does not show pretext on this basis.

Plaintiff additionally asserts that Waldie gave her little assistance. He acknowledged

that he never went on any sales calls with her (Waldie depo. 39) but that he did go on sales

calls with her male replacement (*Id.* 40) and with the other male sales people. (pltf. depo.

118-119)[5] However, plaintiff's position that pretext is shown because Waldie did not assist

---

[5]     Plaintiff's assertion that Waldie took the males golfing is presented in the context
of treating similarly situated non-protected employees differently.  This is an
alternative element of the prima facie case, i.e., as to the fourth element plaintiff
must prove that she was replaced by a male or treated less favorably.  Plaintiff
was replaced by a male and defendants conceded that the prima facie burden was
met. Therefore, the Court need not address whether plaintiff was treated
differently.  Nevertheless, plaintiff has made no showing that the other males

18

her by accompanying her on sales calls is based on conjecture.  When asked why he did not

go on sales calls with plaintiff, Waldie testified that "I had to look at where the premiums are

coming from so I had to go to my bigger offices first.  By the time I got to Kris, that's when I

started to get the information on Kris, then started to talk to Kris about her performance."

(Waldie depo. 39) The Court has no basis to question defendants' stated reason for plaintiff's

termination based on the fact that Waldie did not take her on sales calls.

Furthermore, the evidence shows that plaintiff's performance was suffering since 2007

and she was receiving progressive discipline since 2008.  This was well before Waldie

supervised her.  In fact, Mollman issued plaintiff's first written warning in 2008.  Waldie did

not replace Mollman until November 2008. Additionally, Waldie averred that when he started

in 2008, plaintiff was already on written warning for failing to meet her 2008 goals.  (Waldie

aff. ¶ 4)  Therefore, it would be unreasonable to infer pretext from the lack of Waldie's

assistance as plaintiff was already under her goals when he took over.  Moreover, plaintiff

acknowledged that she had weekly telephone conference calls with Waldie to discuss her

progress following the final warning. (pltf. depo. 94-95) While she did not like the weekly

calls, she acknowledged that it was appropriate that defendants would closely monitor an

employee on final written warning.  (*Id.*)  Therefore, Waldie did try to assist her in this

respect. Further, because she did not know of anyone else on a final written warning (*Id.* 96),

plaintiff cannot assert that she was treated less favorably than males who might also have

---

were "similar in all of the relevant aspects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir.1998).  The Court has nothing beyond plaintiff's testimony that it was "common knowledge" that Waldie took male sales representatives on golf outings.  (pltf. depo. 118-119)

19

been in this position.

Plaintiff points to Waldie's testimony that he never terminated anyone else at Principal for failing to meet his sales goals. (Waldie depo. 50) But, Waldie's testimony makes clear that once he started the progressive discipline process and had weekly meetings with an employee, the employee would voluntarily quit prior to discharge because he could "see the train coming." (*Id.* 50-51) Elsewhere in his testimony, Waldie identified four male sales representatives whom he put on final warning which caused them to quit. (*Id.* 21-22) Additionally, Waldie's affidavit testimony is undisputed that in 2008 and 2009 he issued verbal and written warnings to all sales representatives who failed to meet their sales goals regardless of gender.  He also conducted weekly conference calls with sales representatives who failed to meet their goals in order to help them improve their performance.  (Waldie aff. ¶ 6)

Like Waldie, Greg Mollman (Waldie's predecessor) also avers that from 2007 through 2009, he issued verbal and written warnings to sales representatives who failed to meet their sales goals, regardless of their gender.  (Mollman aff. ¶ 9) Plaintiff's statement in her affidavit that "to her knowledge" males did not receive verbal warnings is self-serving conjecture.

Finally, plaintiff asserts that Waldie testified at deposition that plaintiff was terminated based on her 2009 performance, but his affidavit testimony is that she was failing to meet her sales goals in 2007, 2008, and 2009.  (Waldie Aff ¶ 4, depo 46).  But, Waldie's deposition acknowledges that plaintiff was terminated because she "hadn't hit goal I think in the three years proceeding, and again, not even close to coming to goal."  (Waldie depo. 46-47) Thus, there is no conflict.

20

In sum, plaintiff fails to demonstrate that defendants' stated reason for her termination had no basis in fact and was actually a pretext for gender discrimination.  Rather, plaintiff admitted at deposition that she failed to meet her sales goals in 2007, 2008, and 2009.  (pltf. depo. 54-55, 67, 88-89) It is undisputed that plaintiff received progressive discipline in the form of warnings and that she was terminated following her failure to meet the expectations issued in the final warning.  Other male sales representatives were treated in a likewise manner by defendants if they failed to reach their sales goals. Finally, plaintiff was retained at the end of 2008 when a reduction in force eliminated the other Cleveland sales representative who is male and had more seniority than plaintiff.

**Conclusion**

For the foregoing reasons, defendants' Motion for Summary Judgment is granted.

IT IS SO ORDERED.


 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 3/21/12

21